**TENNESSEE COMMERCIAL WAREHOUSE, INC., Plaintiff-Appellee,**

v.

**Jayne Ann WOODS, Commissioner of Revenue, Defendant-Appellant.**

Supreme Court of Tennessee.

Aug. 4, 1980.

Marian F. Harrison, William R. Willis, Willis & Knight, Nashville, for plaintiff-appellee.

Joe C. Peel, Asst. Atty. Gen., William M. Leech, Jr., Atty. Gen., Nashville, for defendant-appellant.

## OPINION

HARBISON, Justice.

This case involves the interpretation of a portion of Chapter 352 of the Public Acts of 1977,[1] relieving persons possessing unstamped tobacco products from the state tobacco tax under certain circumstances. The Chancellor held that the taxpayer was not liable for the tax under the undisputed facts in the record. We affirm that decision.

Appellee, Tennessee Commercial Warehouse, Inc., is a licensed tobacco manufacturer's warehouse within the purview of the Tobacco Tax Law, T.C.A. §§ 67–3101 to 3127. Its business includes the warehousing of unstamped tobacco products owned by out-of-state manufacturers.

Prior to the effective date of the 1977 statute mentioned above, T.C.A. § 67–3105 provided that the possessor of foreign stamped or other unstamped tobacco products

"... shall be unconditionally liable for the tax imposed by this chapter for each and every foreign or other unstamped tobacco product removed from inventory and not sold as above defined or exported from the state of Tennessee."

Prior to the amendment, warehousemen such as appellee were absolutely liable for the tax upon unstamped tobacco products removed from their inventory without sale or export, regardless of the reason and without exception. The record reveals that appellee had in the past been required to pay the tax upon products which were stolen from its warehouse.

The 1977 statute, which retroactively applied to all losses occurring after January 1, 1976, according to its caption, was enacted "... to permit reduction of inventory for an unstamped tobacco product loss due to theft ...."

The portion of the amending statute applicable to this case provides:

"Every person authorized by this chapter to possess foreign stamped or other unstamped tobacco products may, however, be permitted to reduce his inventory by the amount of any unstamped tobacco product loss due to theft occurring in connection with a breaking and entering upon their premises without being subjected to tax on such amount if acceptable proof is supplied the department as soon as possible after the loss occurs reflecting that the theft was promptly reported to the proper law-enforcement agency and that the insurer who insured the goods paid a claim for the loss. The amount of inventory reduction acknowledged by the department as being supported by proof of loss satisfactory to the commissioner shall be evidenced by a certificate furnished to such person following receipt of required proof and said certificate shall be retained by him as authorization for it."

On May 21, 1976, thieves broke and entered appellee's warehouse by knocking a hole in the side wall of the building. Mr.

---

1. Amending T.C.A. § 67 3105.

Phillip B. George, president of appellee, discovered the break-in upon his arrival at the warehouse the following morning, and he immediately reported the incident to the police. Because an inventory had been taken on the previous day, Mr. George was able to ascertain the extent of the loss with considerable accuracy; some seventy-two and one-half cases, or 43,500 packages, of unstamped cigarettes were stolen.

According to a report of investigating officers:

"Entry to the building was gained by knocking a hole in the concrete wall on the South side of the building. The hole is almost exactly in the middle of two photoelectric eye beams which are pointed North-South. The thieves went up and down a row approximately 30 feet and stopped before getting near the beam. The alarm was not tripped during the night. They took only the fast-moving items, a complete list will be attached. The entry hole is approximately 2½" above an alarm wire, which, if cut, would have activated the alarm."

Within a fairly short time, police apprehended and arrested three persons in connection with the burglary. Confessions were obtained from some of those involved, and at least one of them made arrangements for restitution to the manufacturer-owner of some of the cigarettes. A portion of the inventory which was stolen was recovered in the course of the police investigation.

An audit of appellee by the Miscellaneous Tax Division of the Tennessee Department of Revenue covering the period in which the theft occurred revealed a net shortage in inventory of 24,900 packages of cigarettes. It apparently is agreed by the parties that this shortage was occasioned by the burglary which occurred in May, 1976. The amount of tax due on the net inventory shortage was assessed by appellant and paid under protest by appellee, which claimed the benefit of the relief provisions contained in the 1977 statute quoted above.

Appellee carried liability insurance upon its operations with the Firemen's Fund Insurance Company. That company investigated the loss but ascertained that appellee had been guilty of no negligence or other fault which would render appellee liable for the inventory loss. T.C.A. § 47–7–204(1) provides that a warehouseman is liable for damages for loss of or injury to goods

"caused by his failure to exercise such care in regard to them as a reasonably careful man would exercise under like circumstances but unless otherwise agreed he is not liable for damages which could not have been avoided by the exercise of such care."

Appellee reported the loss to its insurance carrier, but the carrier determined that the burglary, committed under the circumstances described above, resulted in a loss for which appellee was not legally liable. Accordingly no payment on account of the loss was made by the liability insurer of appellee.

Appellee also reported the burglary and the resulting inventory loss to three tobacco manufacturing companies which were the owners and consignors of the stolen tobacco products. After investigation, each of these companies agreed that appellee had been guilty of no negligence and was not responsible for the loss by contract or otherwise. Each of the manufacturers reported its respective portion of the loss to its own insurance carrier. In each instance, however, the amount of the loss suffered by the respective owners was less than the deductible amount contained in the insurance policy carried by such owner, so that no insurance carrier for any of the owners made any payment on account of the loss. As stated, one of the owners, Phillip Morris, obtained restitution from one of the burglars. Its total loss, however, like the others, fell within the deductible limits of its insurance policy. Each of the owners of the stolen inventory absorbed its own loss, therefore, and each completely absolved appellee of any liability or responsibility in connection with the burglary and the resulting inventory shortage. There is no suggestion of fraud or collusion or of the employment of any sort of artifice to evade the tobacco tax.

It will be observed that the 1977 statute, under which relief from the tax was granted appellee by the Chancellor, contains a number of conditions or circumstances all of which must be shown to exist in order for the possessor to avoid liability. These are as follows: ·

(1) loss must be due to theft;

(2) the theft must occur in connection with a breaking and entering upon premises of the possessor of unstamped tobacco products;

(3) acceptable proof must be supplied to the Department of Revenue as soon as possible after the loss occurs;

(4) such proof must reflect that the theft was properly reported to a proper law-enforcement agency; and

(5) "the insurer who insured the goods paid a claim for the loss."

There is no question but that all of the terms and conditions of the statute were met by appellee except the last, pertaining to the payment of an insurance claim. The entire dispute between the parties concerns the meaning and effect of that provision of the statute.

Appellant insists that the statute is not ambiguous and must be enforced as written by the General Assembly. One of the conditions of relief from taxation afforded by the statute is that an "insurer" must have paid a claim. Since there was no such payment in this case, appellant insists with considerable logic that appellee has not met the terms and provisions of the statute and that it is therefore liable for the disputed tax.

Appellant's position is not without merit. T.C.A. § 67–3105, as amended, provides that the possessor of unstamped tobacco products shall be "unconditionally liable for the tax" upon removal of such products from inventory without sale or export; by the amendment, however, relief is afforded in cases of theft due to burglary under specified conditions.

Appellant points out that this statute is part of a general scheme of taxation, and that the sale of untaxed or "bootleg" tobacco products coming into Tennessee from its many surrounding states is a major problem to revenue officials in the state. There is a definite reason and policy behind the provisions imposing such strict liability upon the possessors of unstamped tobacco products, and this policy cannot be disregarded by the courts.

Further, appellant insists that if the 1977 amendment be construed as an exemption from taxation, such exemption should be strictly and narrowly construed against the taxpayer and in favor of the taxing authority. It is well settled that a taxpayer has the burden of making an affirmative showing of his right to an exemption; taxation is the rule and exemption from taxation is the exception. *Automatic Merchandising Co. v. Atkins*, 205 Tenn. 547, 327 S.W.2d 328 (1959); *Hamilton National Bank v. McCanless*, 176 Tenn. 570, 144 S.W.2d 768 (1940). As stated by the Court in *Woods v. General Oils, Inc.*, 558 S.W.2d 433, 435 (Tenn.1977):

" . . . the burden is on the taxpayer to establish his exemption; every presumption is against it and a well-founded doubt is fatal to the claim."

On the other hand, appellee insists that the cardinal rule of statutory construction is to ascertain and give effect to the intent or purpose of the General Assembly as expressed in the statute. *Crown Enterprises, Inc. v. Woods*, 557 S.W.2d 491, 493 (Tenn. 1977). Further, revenue statutes should be given a fair construction to effect the end for which they were intended. *United Inter-Mountain Telephone Co. v. Moyers*, 221 Tenn. 246, 255, 426 S.W.2d 177 (1968).

As we have already noted, the caption to the 1977 amendment stated that one of the purposes of the enactment was to permit reduction of inventory for unstamped tobacco products where there was a "loss due to theft."

In the present case there can be no question but that there was such a loss, and that all of the terms, provisions and conditions of the remedial legislation were fully met, except that respecting payment by an insurer.

At no point in the statutes dealing with the tobacco tax or in those dealing with warehousemen is there any requirement that either the owner of inventory or the operator of a licensed warehouse carry insurance of any kind. Appellee insists that the condition of the 1977 statute has application only when it is shown that there existed insurance coverage applicable to the loss, and that only when an insurer having coverage has denied a claim should a possessor of untaxed products be required to pay the tax attributable to an inventory reduction.

The Chancellor so construed the statute and held that a taxpayer could claim relief from the tax without respect to the insurance clause if no one had obtained insurance which covered the particular loss and if all of the other conditions of the statute were met.

■ We are not satisfied that this interpretation fully complies with the intention of the General Assembly. We agree with appellant that the requirements that a claim be reported to proper law enforcement officials and that some part of the loss be paid by an insurance carrier were inserted to insure authenticity of the theft loss and to relieve the Department of Revenue from having to make an investigation into disputed or doubtful claims. We think that there must be either a verification and payment of the loss by an insurer or some equivalent thereof.

Even so, the phrase "the insurer who insured the goods" is, in our opinion, ambiguous and of uncertain meaning in the context used. In an opinion on the subject, the Attorney General concluded that the words "the insurer" could refer either to a liability insurer or to an insurer against direct loss of inventory due to theft. Of course, a liability insurer, such as that of the warehouseman in the present case, does not directly "insure the goods" as does the underwriter in a burglary or theft policy. Nevertheless we agree with the Attorney General that either type of insurance payment would satisfy the purposes of the statute even though, closely construed, only direct first-party insurance on the inventory carried by someone having an insurable interest therein would literally comply with the words used by the Legislature.

The statute not only does not delineate the type of insurance contemplated; it makes no reference to deductible features such as those contained in each of the policies carried by the manufacturer-owners in this case. The three owners involved were the R. J. Reynolds Tobacco Company, Phillip Morris, and Brown & Williamson Tobacco Corporation. Each of these large tobacco manufacturing and distributing companies recognized the authenticity of the loss in the present case and, in effect, each absorbed the loss on its own, apparently after inquiry and investigation.

■ If, as appellant concedes, liability insurance would constitute an equivalent to the literal requirements of the statute, we see no reason why other kinds of equivalent safeguards should not also be sufficient. We are of the opinion that under the circumstances shown here there was the equivalent of payment by a commercial insurance carrier sufficient to entitle the taxpayer to the benefit of the remedial statute, and that relief should not be denied simply because a third-party insurance carrier or a first-party insurance carrier did not literally pay a claim to the warehouse or to the owners. Both types of coverage had actually been procured in the present case. Insofar as the record shows, the warehouseman carried no first-party coverage of its own on the inventory stored on its premises. Its third-party coverage on the warehouse operations did not apply because of the absence of any legal liability on its part. The first-party insurance carried by the owners covered only losses greater than those involved here. Under those circumstances, each of the owners, in effect, was self-insured to the extent of the deductible amount in its policy. Each bore its own loss and exonerated the warehouseman.

Under these circumstances we find that the self-insured, financially responsible owners represented the equivalent of an "insurer who insured the goods." We be-

lieve that it would be contrary to the intention of the General Assembly and quite harsh, under these facts, to require the warehouseman to pay the tax and to deny him the relief which the Legislature apparently intended to grant in cases of verified theft loss due to burglary. If our interpretation is not in accord with the legislative intent, a clarifying amendment to the statute can be supplied.

For these reasons, we are of the opinion that the result reached by the Chancellor is correct. The judgment is affirmed at the cost of appellant. The cause will be remanded to the chancery court for enforcement of the judgment and for such further orders as may be appropriate.

BROCK, C. J., and FONES and COOPER, JJ., concur.